46 N.J. Super. 353 (1957)
134 A.2d 743
JOAN VALLS, NOW KNOWN AS JOAN ETTINGER, PLAINTIFF-RESPONDENT,
v.
PARAMUS BATHING BEACH, INC., A CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1957.
Decided September 20, 1957.
*355 Before Judges CLAPP, JAYNE and HUGHES.
Mr. Samuel A. Larner argued the cause for appellant (Mr. Wilbur A. Stevens, attorney).
Mr. Raymond Chasan argued the cause for respondent (Mr. Julius Y. Schwartz, attorney).
The opinion of the court was delivered by JAYNE, J.A.D.
It was on Sunday, July 30, 1950 that the plaintiff, then 17 years of age, in company with Margaret Ulbich and Frances Azzolini, was escorted by Patrick Greene at 10 o'clock in the forenoon to the recreation grounds conducted for profit by the defendant in Paramus, Bergen County. It is said that a merry heart goes all the day. It was about 6 o'clock in the late afternoon when the mishap to which this litigation relates occurred on the premises.
The defendant's site is evidently a popular locality during the summer season, normally attracting as many as from two to three thousand patrons on Sundays. Among its attractions is a relatively spacious swimming pool in which at a point some 50 feet from the shore is stationed a raft for diving, having the dimensions of about 30 feet in length and 18 feet in width. Four or five lifeguards are in attendance.
The plaintiff and her young friends were swimmers, and throughout the day they periodically enjoyed the use of the pool. It seems to have been observable that boys would at times engage in the frolicsome exhilaration of pushing each other unexpectedly off the raft. See exhibit of posted safety notice.
As the hour of 6:00 approached and the number of swimmers had lessened, the plaintiff and her friends swam *356 to the raft, where the plaintiff was seated when some boys began the antics heretofore mentioned. In consequence, the plaintiff resolved to leave the raft. She dove into the water and had not yet ascended to the surface when a boy was playfully propelled off the raft. His chest collided under water with the plaintiff's head, rendering her temporarily unconscious and causing her, it is alleged, permanent bodily injury.
Somewhat oddly, her present action to recover from the defendant compensatory damages for her injuries and losses so sustained was not instituted until December 12, 1955. She therein accused the defendant of failing reasonably to protect her safety. The verdict of the jury awarded her $25,000 damages.
In the appellate consideration of one of the points specified for the reversal of the judgment, it becomes pertinent to note that the defendant expressly averred in its answer, with iteration in the pretrial order, that the plaintiff knowingly and voluntarily assumed the risk that imperiled her and failed to exercise due care for her own safety, yet no mention whatever of those defenses was embodied in the court's instructions to the jury. Correlatively, it is apparent that no request to treat those defenses in the charge to the jury was presented to the court, and moreover no objection was registered at the trial to the court's omission to do so.
We deemed it advantageous to write briefly concerning a somewhat analogous occurrence in Gabriel v. Auf Der Heide-Aragona, Inc., 14 N.J. Super. 558 (App. Div. 1951). Following pertinent quotations from the cited authorities (14 N.J. Super. at pages 563 et seq.) we issued the comment:
"We conceive it to be at least the conventional function of the judge even in the absence of requests of counsel intelligibly to present to the jury the material and substantial issues of fact disclosed by the pretrial order, drawn into controversy by the conflicting, divergent and contradictory evidence adduced at the trial and to be submitted to the jury for determination, together with instructions in the law adapted to the consideration of such issues. How otherwise may we be confident that the jury distinctly recognized any such issue and deliberately resolved it?"
*357 While we continue to advocate the "conventional function of the judge even in the absence of requests of counsel," to which we then alluded, we neither did then, nor do now, regard even a material omission in a charge, in the absence of an appropriate request, as constituting in itself alone a reversible error on appeal.
Experience has induced us to recognize that pleaded issues which are not prominently projected by supporting evidence, nor earnestly debated by the attorneys at the trial, may inadvertently elude the attention of the most circumspect judge. The author of this opinion stated in his dissenting opinion in Marzotto v. Gay Garment Co., 11 N.J. Super. 368, at page 384 (App. Div. 1951):
"But in reviewing judicial action on appeal, the unity of pragmatical acceleration and academic precision may be recognized as a cherished ideal, but during the period of progression toward that visionary destination, the limitations of human capacities of circumspection should not be ignored."
While in the instant case the attorney of the defendant may have reasonably supposed that the learned trial judge would without a specific request inform the jury of all of the defenses interposed by the answering pleadings and elucidate the applicable principles of law, yet the obvious failure of the judge to do so in the state of the evidence here was never brought to his attention. Cf. Kreis v. Owens, 38 N.J. Super. 148, 155 (App. Div. 1955). That omission in its significance has a reciprocal relation to the asserted prejudicial omission of the judge.
Oversight and inadvertencies of the court deemed to be harmless and unimportant by the attorney at the trial cannot without diligent objection be normally exaggerated on appeal. In such exigencies a degree of passive indifference, if not acquiescence, is inferred. Fath v. Thompson, 58 N.J.L. 180, 186 (E. & A. 1895); Priest v. Poleshuck, 15 N.J. 557, 564 (1954).
But counsel now representing the defendant on appeal proposed that the incomplete instructions of the court *358 attained the stature of "plain error" within the intended compass of R.R. 1:5-3(c), 2:5. Obviously not so.
It is not the discovery of an error that is merely plain, i.e., apparent, distinct, undisguised, that warrants a nullification of the judgment. It must be one that prejudicially affects the substantial rights of the aggrieved party. In re Stern, 11 N.J. 584, 590 (1953); Harpell v. Public Service Coordinated Transport, 20 N.J. 309, 318 (1956); Ford v. Reichert, 23 N.J. 429, 434 (1957). The rule is sparingly employed.
Here, however, the criticized omission of the trial judge in the absence of a request to charge in those particulars, and especially in default of any relevant objection whatever thereto, cannot be appraised as a legal error.
Another point advocated on behalf of the appellant has similar characteristics. It pertains to the admission in evidence by stipulation of the life expectancy tables in relation to the estimated future life of the plaintiff. There was testimony that certain elements of her cranial injury were permanent.
In Kappovich v. LeWinter, 43 N.J. Super. 528, 533 (App. Div. 1957), we stated:
"* * * We desire, however, to emphasize that the admission of such approved tables for the consideration of the jury should always be accompanied by cautionary instructions concerning their inconclusive import and limited significance."
In this incident of the trial the mindfulness of the judge was neither alerted to the subject by a request to inform the jury of the import and significance of the approved tables, nor was the subject in any other manner invited to his attention. This judicial unobservance inhabits the same category as that previously discussed. No reversible error in law is established.
An explanation of another ground urged for reversal is in order. Essentially it concerns the privilege accorded Dr. Lester Siegel to testify as a witness for the plaintiff.
The prefatory information is that prior to the trial interrogatories were addressed by the defendant to the plaintiff *359 requesting the names and addresses of all physicians who had administered medical treatment to the plaintiff for her bodily injuries, an itemization of all moneys expended to hospitals, nurses, physicians, and surgeons for services rendered the plaintiff, and the names and addresses of all persons possessing knowledge of any facts relevant to the allegations of plaintiff's complaint in the pending action. R.R. 4:23-1. Admittedly, the verified answers to the inquiries did not state the name and address of Dr. Siegel, although in fact Dr. Siegel had previously examined the plaintiff and submitted a charge of $25.
Two days before the trial, one of plaintiff's attorneys informed an attorney of the defendant that he desired to introduce the testimony of one Dr. Siegel, an expert neurologist. The defendant's attorney, reasonably anticipating from copies of the medical reports that some expert testimony of a neurologist would be presented by the plaintiff, is said to have expressed no objection provided he received immediately a copy of the written findings of Dr. Siegel. The requested report was not delivered to the attorney of the defendant until during the progress of the trial Dr. Siegel was called to the witness stand to testify. Hence the plaintiff's use of Dr. Siegel as a witness encountered prompt objection. We may pause here to interpolate that the doctor's qualifications were not impugned, nor was it intimated that there was in the dereliction a design to deceive or conceal.
It was divulged to the court that the plaintiff expected to call as its witness one Dr. Zitani, who had attended the earlier period of the trial, and in the contemplation of his necessary absence from the trial, the plaintiff had engaged the substitutionary services of Dr. Siegel. Dr. Zitani, it is said, was not available at the afternoon session of the trial.
The objection appears to have been inspired merely by the failure of plaintiff's attorney to respect the conditional waiver of the ten-day procedural requirement of notice. R.R. 4:23-12. We are not unfamiliar with the rule and with such pertinent decisions as reported in Evtush v. Hudson *360 Bus Transp. Co., Inc., 10 N.J. Super. 45 (App. Div. 1950), affirmed 7 N.J. 167 (1951); Abbatemarco v. Colton, 31 N.J. Super. 181 (App. Div. 1954); Burke v. Central Railroad Co. of N.J., 42 N.J. Super. 387 (App. Div. 1956), but we witness in contrast and distinction the decisions in Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293, 308 (1953); Gibson v. Kennedy, 23 N.J. 150, 160 (1957); Gibilterra v. Rosemawr Homes, Inc., 32 N.J. Super. 315, 322 (App. Div. 1954), affirmed 19 N.J. 166 (1955); Barber v. Vaccaro, 32 N.J. Super. 573, 579 (App. Div. 1954), certification denied 17 N.J. 523 (1955).
Upon deliberate consideration of the somewhat divergent representations of the attorneys, the trial judge resolved in the exercise of his discretion to permit Dr. Siegel to testify subject to what he deemed to be an adequate safeguard against the resultant visitation of prejudice and injustice on the defendant.
He said:
"The Court, of course, is obliged to take the final position here on the grounds of the dubious and controversial set of facts that counsel have been arguing here. I am disinclined to exclude Dr. Siegel's testimony.
However, by way of ameliorating whatever circumstances that inflicts upon counsel for the defendant, I will hear counsel for the defendant in due course as to any accommodations he may require for the return of Dr. Siegel, or with respect to any other matters concerning which he makes application to the Court.
That is the ruling.
All right, Doctor, you may be sworn."
It is notably influential in our conception of the harmless impotency of the court's discretionary ruling that thereafter Dr. Siegel was cross-examined and the attorney of the defendant did not thereafter regard it to be either usefully defensive or advantageous to avail the defendant of the protective opportunities reserved for it by the court. We are not persuaded that the ruling here challenged was such a manifestly mistaken exercise of discretion as to necessitate a reversal of the judgment. Vide, Gibson v. Kennedy, 23 N.J. 150, at pages 160, 161 (1957).
*361 We are not favorably impressed by any other assignment of legal error said to have influenced prejudicially the determination of the defendant's alleged liability.
We therefore now reach the request to review the quantum of the compensatory damages awarded to the plaintiff by the jury. The range of our considerations ought to encompass not only the prognosis contemplated by the medical men who testified, but also the nature of the symptomatology in fact exhibited by the successive deportment and general activities of the plaintiff and its derivative inferences. Then, too, although we have declined to standardize the grounds of appeal heretofore discussed as of themselves reversible legal errors, we should not ignore entirely their tendencies perhaps in relation to the jury's measuring scale of compensatory damages.
As previously revealed, the award was $25,000, a relatively substantial allowance even in the present monetary economy.
There exist in the case some impressive characteristics that shed a deep shadow of doubt concerning the asserted persistency and continuity of the plaintiff's disability. Their presence, as revealed by the record, present to us the difficulty of attempting to reconcile the irreconcilable. Suffice to summarize them: (a) plaintiff was confined to a hospital over night on July 30, 1950 and again thereafter for a period of four days beginning August 3, 1950, since which time she has had no additional hospitalization; (b) she suspended her usual employment until on or about September 25, 1950, which is less than two months; (c) most significantly, the plaintiff has continuously and regularly pursued without physical impediment her employment for the span of more than six years intervening between September 25, 1950 and January 23, 1957, the date of trial; (d) the expenditures for her medical care and treatment appear from the proof not to have exceeded $140, and no loss of wages seems to have been established; (e) the propitious circumstance that she deemed herself to be able to enter matrimony in 1956; and (f) the absence of guidance by the court in the jury's application of the life expectancy *362 tables. Also, somewhat inexplicable in the circumstances, is the tardiness with which this action was instituted.
It is to be observed that the defendant's application for a new trial was denied by the trial court. We are not heedless of the pertinent admonition pointedly expressed by the Supreme Court in Hartpence v. Grouleff, 15 N.J. 545, 549 (1954). However, we also notice that in the determination of the motion, the court, in his conception of the quantum of the award, remarked: "Now, you ask me to reduce this verdict and I am in a quandary as to how to do that." "The Court, strictly speaking, may be in error to an extent in refusing to disturb the verdict, but the trouble is that there is no strict way of getting at it." The foregoing quotations are indicative of the court's perplexity and his inclination conditionally to grant a new trial in the absence of consent to a reduction in the amount of the verdict.
Our panoramic review of the trial record induces us in the interest of substantial justice to remand the action for a new trial limited solely to the determination of the issue of damages. Hager v. Weber, 7 N.J. 201 (1951); Dahle v. Goodheer, 38 N.J. Super. 210 (App. Div. 1955), certification denied 20 N.J. 534 (1956); Sheenan v. Coca-Cola Bottling Co. of N.Y., 41 N.J. Super. 213 (App. Div. 1956), certification denied 22 N.J. 268 (1956).
Mandate accordingly.